1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF GEORGIA
2                          AUGUSTA DIVISION

3

4    UNITED STATES OF AMERICA        :
                                     :
5                                    :   Case No. 109-CR-073
                                     :
6    vs.                             :
                                     :
7                                    :
     DERRICK D. KING,                :   Augusta, Georgia
8                                    :   April 13, 2010
                    Defendant.       :   10:59 a.m.
9    _____

10

11

12                            SENTENCE
                  BEFORE THE HONORABLE J. RANDAL HALL
13                   United States District Judge

14

15   APPEARANCES:

16   For the Government:    NANCY GREENWOOD, AUSA
                            U.S. Attorney's Office – Augusta
17                          P.O. Box 2017
                            Augusta, Georgia 30903
18                          (706) 724-0517

19   For the Defendant:    J. EDWARD ENOCH JR., Esquire
                            J. Edward Enoch, PC
20                          3540 Wheeler Road, Suite 309
                            Augusta, Georgia 30909
21                          (706) 738-4141

22   Reported By:          Rhea Rangel, RPR
                            Southern District of Georgia
23                          1417 Troupe Street
                            Augusta, Georgia 30904
24                          (706) 823-6468

25

1                          I–N–D–E–X

2    **OBJECTIONS TO PRESENTENCE REPORT:**
             By Mr. Enoch . . . . . . . . . . . . . 5
3            By Ms. Greenwood . . . . . . . . . . . 6
             By the Court . . . . . . . . . . . . . 8
4

5            By Mr. Enoch . . . . . . . . . . . . . 9
             By Ms. Greenwood . . . . . . . . . . .11
6            By Mr. Enoch . . . . . . . . . . . . .14
             Direct Examination of Randall Mitchell .16
7            Cross-Examination of Randall Mitchell . 44
             Redirect of Randall Mitchell . . . . . .54
8            By the Court . . . . . . . . . . . . .56

9
             As to Untimely Objections. . . . . . .58
10           Ruling by the Court. . . . . . . . . .64

11

12   **ALLOCUTION AND MITIGATION:**

13           By Mr. Enoch . . . . . . . . . . . . .65
             By the Defendant . . . . . . . . . . .71
14

15   **ARGUMENT BY THE GOVERNMENT:**

16           By Ms. Greenwood . . . . . . . . . . .72

17

18   **IMPOSITION OF SENTENCE BY THE COURT. . . . . . .76**

19

20

21

22

23

24

25

```
 1                     P-R-O-C-E-E-D-I-N-G-S

 2              (Court was called to order at 10:59 a.m.)

 3              THE CLERK:  Good morning.  This morning we're here to

 4    conduct a sentencing in the case of the *United States of*

 5    *America versus Derrick D. King*, Criminal Action Number

 6    CR109-073.

 7              All parties are present and ready to proceed, your

 8    Honor.

 9              THE COURT:  Good morning, everyone.

10              THE ATTORNEYS:  Good morning, your Honor.

11              THE COURT:  The Court will note the following

12    appearances for the purpose of this morning's hearing.  On

13    behalf of the United States Government, Assistant United States

14    Attorney Nancy Greenwood.  On behalf of the defendant, Edward

15    Enoch.

16              And are you Derrick D. King?

17              THE DEFENDANT:  Yes, sir.

18              THE COURT:  The Court notes the defendant is present

19    in court this morning and, again, is represented by counsel.

20              Derrick D. King appeared before this Court on

21    January 7, 2010, accompanied by his attorney, Edward Enoch Jr.,

22    for a Rule 11 Proceeding.  Pursuant to a plea agreement, the

23    defendant pled guilty and was adjudged guilty of a lesser

24    included offense of the indictment charging him with conspiracy

25    to distribute and possess with intent to distribute cocaine
```

1   hydrochloride and five grams or more of cocaine base in

2   violation of 21 United States Code Section 841(a)(1) and 846.

3          Upon completion of the Rule 11 Proceeding and the

4   Court's acceptance of the guilty plea, the Court directed the

5   probation office to prepare a Presentence Report and to

6   disclose the report to the government and to the defendant.

7          Ms. Greenwood, I assume that the government has had

8   an opportunity to review this report; is that correct?

9          MS. GREENWOOD:  Yes, your Honor.

10          THE COURT:  And you filed no objections, also,

11   correct?

12          MS. GREENWOOD:  Yes, your Honor.

13          THE COURT:  Thank you.

14          Mr. Enoch, I note -- first, have you and your client

15   had an opportunity to read and to discuss this Presentence

16   Report?

17          MR. ENOCH:  Yes, sir, your Honor.

18          THE COURT:  Now, I believe that you have filed two

19   objections to the report, one involving Paragraph 13 and one

20   involving Paragraph 18, correct?

21          MR. ENOCH:  Yes, sir, your Honor.

22          THE COURT:  Are those still valid objections?

23          MR. ENOCH:  Yes, sir.

24          THE COURT:  The first objection, then, is to the last

25   line of Paragraph 13, which says, Between July of 2008 and

1   March of 2009, agents made in excess of ten controlled

2   purchases of narcotics from Reginald Beale, Jaimere Prosser and

3   Marsignor White at 1941 Third Avenue.

4            Do you want to address that, Mr. Enoch?

5            MR. ENOCH:  Yes, sir, your Honor.  In the context of

6   this Presentence Investigation Report, we believe that that's

7   unduly prejudicial information.  It has nothing to do with

8   Mr. King.  And none of those confidential informant purchases

9   were by or through Mr. King.

10           I would say that we're raising these issues, in part,

11  your Honor, because this Presentence Investigation Report is

12  going to follow Mr. King far beyond today.  This is going to be

13  looked at by the Bureau of Prisons and others in making

14  decisions about how his life is spent over the next however

15  many years or months he may receive as a sentence.  So in

16  trying to make this as factually accurate and as narrow to the

17  facts of his conviction, we would ask that that be struck

18  because those controlled purchases were not -- he wasn't

19  involved in those.

20           THE COURT:  Okay.  But that statement deals with the

21  controlled purchases that were made at that -- what's that

22  called?  A trap house, a drug distribution house.  And Mr. King

23  was present there I believe.  Is there any dispute as to

24  whether Mr. King was present from time to time at that trap

25  house?

1          MR. ENOCH:  Well, your Honor, the period of time that

2     was covered here, July '08 until March of 2009, the end of

3     March of 2009 was the beginning of Mr. King's involvement at

4     the trap house.  And that's acknowledged in the PSI.  He was a

5     very, very latecomer to this endeavor.  And so what we're doing

6     is expanding, appearing to expand, the operation to cover all

7     the long period of time that the government was investigating

8     this conspiracy when, in fact, Mr. King was very late on the

9     scene, really just days before the time the trap house was

10    raided.

11          THE COURT:  Ms. Greenwood, would you like to respond

12    in any way to this objection?

13          MS. GREENWOOD:  Yes, your Honor.  I mean, the

14    defendant didn't start living at the trap house until -- or

15    staying there until late in March.  And, also, he really was

16    living there beginning by, certainly by mid-April, is a

17    generous calculation on that.  However, he was certainly aware

18    of the conspiracy before that time as he and Reginald Beale had

19    had conversations about, you know, him coming up and getting

20    involved in the business that they were involved in.  And --

21    one second.

22          But I think that the way conspiracies work, as the

23    Court is well-aware, is, you know, an individual is only held

24    accountable for the activity they are individually involved in

25    or could reasonably foresee that their co-conspirators are

1  involved in.  At this point in time when these ten purchases

2  took place, especially between, you know, back in July of 2008,

3  I don't know exactly whether -- I mean, I don't have any reason

4  to believe that Derrick King was familiar with those particular

5  controlled buys.  But Mr. King was acquainted with Reginald

6  Beale, knew Reginald Beale, from when they were both in prison

7  together at Roger State Prison.  And it's my understanding that

8  they were in communication with one another.

9        I think that this sentence is simply a sentence that

10  talks about the nature of the conspiracy itself and gives an

11  overview, not only of Mr. King's involvement, but of the

12  conspiracy itself.  It demonstrates that this is a trap house

13  that was being used on a regular basis by the co-conspirators,

14  and it was being used that way at the time that Mr. King became

15  involved in this conspiracy.  And I think this is perhaps just

16  historical data, but relevant data, at a time when Mr. King was

17  going to be more directly involved in this conspiracy.

18        It's my understanding that the PSI can certainly

19  encompass more information than what the defendant specifically

20  did or what the defendant has specifically pled guilty to.  The

21  purpose of a PSI is to fully inform the Court of the character

22  and nature of, not just the defendant, but the offense itself

23  and the conspiracy that's involved in this case.  And I think

24  that's what this sentence does.

25        But, you know, the government doesn't take a strong

1    position one way or the other on whether or not this line stays

2    in.  But I'm sure it was in there because it's probably in

3    every other PSI in this case, every other codefendant in this

4    case or virtually every other one.  And that's the practice of

5    the probation office to provide as much information as possible

6    to provide a context for the criminal activity.  And that's

7    what, I believe, this sentence does.

8              THE COURT:  Okay.  All right.  I've considered the

9    defendant's objection to the last sentence of Paragraph 13.

10   I've listened to the argument of the counsel for the defendant

11   and I've also listened to the response by the government's

12   counsel.  And after reading the sentence, the Court overrules

13   the objection finding that the information is not unduly

14   prejudicial, rather, simply is descriptive of the level of

15   confirmed drug activity that was occurring at the trap house

16   prior to and at the time that the defendant began to frequent

17   the house for the purpose of engaging in the activities that

18   are the subject of this conspiracy.

19             Therefore, again, the Court will overrule that

20   objection and allow that sentence to remain in the Presentence

21   Report.  The Court also notes that the sentence has no bearing

22   on the defendant's sentence or on his offense level today.

23             Now, the second objection raised by the defendant is

24   to Paragraph 18.  Specifically, the defendant objects to the

25   calculation of the drug quantity in Paragraph 18.  And,

1   Mr. Enoch, I'll let you address that objection.

2          MR. ENOCH:  Your Honor, as we stated in our

3   objection, this comes from Paragraph 18 of the Presentence

4   Investigation Report, which there is really two quantities of

5   drugs being attributed to Mr. King in this Presentence

6   Investigation Report.  One is that which is in Paragraph 19,

7   which are the quantities that were discovered at the trap house

8   at the time he was there and it was raided.  And we're not

9   trying to say that those quantities shouldn't be accounted

10  against him.

11          But in Paragraph 18 what we've got is a calculation

12  of a presentence investigator, the probation office, making an

13  educated guess about what quantity Mr. King himself dealt at

14  the trap house over the course of a period of days from

15  April 11th to April 27th, 2009.  The quantity that's indicated

16  in Paragraph 18 of approximately a half an ounce of cocaine per

17  day, taking that for 16 days, is how he comes up with a

18  quantity of 226.72 grams.  That information, as best as I can

19  tell, was derived from a report that was prepared by

20  Investigator Mitchell based on an interview with Mr. King on

21  April 27th, the day that the trap house was raided and he was

22  arrested.

23          We take issue with the factual accuracy of that

24  report.  Early on in this -- in the proceedings, before even

25  the entry of the guilty plea, your Honor, I had inquired -- and

1    I don't have my notes with me -- but I had inquired about any

2    substantiating documentation about that investigative report.

3    Whether there was a tape recording, whether there were

4    contemporaneous notes made.  And I was told that there were

5    not.  That it was the FBI's policy not to make notes and not to

6    take any recordings of these confessions or investigative

7    interviews.

8         So we've been traveling purely on the concept that

9    that report was -- that Officer Mitchell and another officer

10   interviewed Derrick King on April 27th with no notes to recall

11   or memorialize what that information would have been.  It was

12   not transcribed until a week later.  Which, the 27th was a

13   Monday.  According to the investigative report, it was not

14   memorialized on paper until the following Monday.  In the

15   meantime, much activity took place in this case.  All of the

16   houses were raided.  All of these defendants were brought in.

17   Many people were interviewed.

18        So we are simply contesting the assignment of that

19   half ounce of crack a day and then extrapolating that to the 16

20   days.  In his acceptance of responsibility, Mr. King has

21   admitted, clearly admitted, that he -- this is in Paragraph 23

22   -- that Reginald Beale fronted him an ounce of cocaine

23   hydrochloride, not base, and that he sold an ounce in Baldwin

24   County.  And he was fronted another two ounces, and he sold

25   those from the trap house.  Clearly, this is a significant

1   issue just because of the disproportionate rate that cocaine

2   base is assigned in the guidelines.

3          THE COURT:  Okay.  Now, Mr. Blevins, you are

4   reporting that this information in Paragraph 18 would have no

5   impact on the guideline range.  Is that correct?

6          MR. BLEVINS:  That is correct, your Honor, because of

7   his career offender status.

8          THE COURT:  Ms. Greenwood, do you want to respond to

9   this objection at all?

10          MS. GREENWOOD:  Yes, your Honor.  I think that the --

11   well, I stand by the agent's report.  I mean, I think that it

12   is, you know -- I don't know that I was directly aware of

13   Mr. Enoch's request for the supporting or corroborating

14   information or documentation.  I think it's pretty well-known,

15   certainly in this community, certainly in the legal community,

16   that the FBI does not tape-record interviews.  And in this

17   particular case, they followed their general policy of not

18   recording interviews.  And, therefore, no recorded interview

19   was made and no tape recorder was turned over.

20          I just learned this morning that Investigator

21   Mitchell did take notes during the interview.  Before -- in

22   fact, I really didn't know that that was, sort of, the nature

23   of the concern until Mr. Enoch and I spoke yesterday about it.

24   And when I had a chance to talk to Investigator Mitchell this

25   morning, he said that he wasn't sure if he had taken notes or

1    not, but if he did that they would probably be preserved in a

2    file in the FBI Office.  So he went by the FBI Office, and,

3    sure enough, in a file was handwritten notes that he had

4    created during the course of the interview that both he and

5    Task Force Officer Butts conducted.  And those have been

6    provided to defense counsel.  They are consistent, in my

7    opinion, with the information that is contained in his report.

8            There was a lot going on between the time that the

9    interview was conducted after the search warrants had all been

10   executed.  So the interviews actually took place after the

11   search warrants were executed.  And then they were transcribed

12   some time later.  I think that the probation office has

13   taken -- even though the defendant admitted to selling drugs

14   out of the trap house for 33 days -- as a very conservative

15   approach, which our probation office is good at taking, limited

16   their calculation to 16 days, the 16 days between April 11th

17   and when the trap house was actually searched and Mr. King was

18   arrested, to come up with their calculation.  And this is all

19   in addition to the 50 grams or more of crack cocaine and other

20   powder cocaine that was found on the defendant, including a

21   gram of crack cocaine that was found in the defendant's pocket

22   at the time that that search warrant was executed.

23           I think that to the extent -- and I am curious about

24   this because this has, sort of, come up a little bit in

25   conversations that I've had with Mr. Enoch, that the defendant

1    may be purporting to say -- I don't want to read too much into

2    this because our hopes are that this is a defendant that is

3    going to cooperate.  He's been cooperative.  He's been

4    providing information on other individuals.  We'd like to use

5    him as a cooperator.  We are concerned that if in this hearing

6    he commits any form of perjury, we're certainly not going to be

7    able to utilize him.  And there are other consequences

8    including losing acceptance of responsibility and perhaps

9    getting an obstruction of justice charge.  So there are lots of

10   different things that, sort of, ride in the balance here.

11           So I don't want to overstate -- and the defendant

12   certainly hasn't said anything yet here today.  And he

13   certainly has the right to challenge what's in the PSI, the

14   report's accuracy, if he feels that it's inaccurate.  But based

15   on the report that we have, based on the conversations I've had

16   with the investigator, based on looking at the notes that he

17   made contemporaneous with conducting the interview, I have

18   every reason to believe -- and we're prepared to put on

19   testimony if the Court would like for us to -- that this

20   defendant told Investigator Mitchell and Task Force Officer

21   Butts that he was selling between a quarter ounce and a half

22   ounce of crack cocaine on the days that he was at the trap

23   house.  And so we believe that this calculation is, though

24   somewhat conservative, is accurate.

25           We also recognize that because he's a career

1    offender, it doesn't really impact his guideline range.  But it

2    is an objection that he's placed, I think, out of the concern

3    that this is a PSI that is going to follow him around.  I think

4    there's some -- this is sort of a new concern to me.  I've not

5    really heard -- I think this is sort of -- but I've heard it

6    several times in recent months.  And so I think there's some

7    conversations going on between prisoners that they are of

8    heightened concern about the information that is contained in

9    PSIs.  I don't have any way to evaluate the accuracy of that.

10            But, anyway, the government is prepared to put on

11    evidence as to what supported probation officer's findings here

12    if the Court would like for us to.

13            THE COURT:  Mr. Enoch, is Mr. King denying that he

14    told the agent on April 27th of '09 that he was supplying a

15    quarter to a half an ounce a day?  I mean, is he disputing that

16    which is in Paragraph 15?

17            MR. ENOCH:  May I confer with my client?

18            THE COURT:  Sure.

19                    (Off-the-record discussion between the

20                     defendant and Mr. Enoch)

21            MR. ENOCH:  Yes, sir, your Honor.  We're concerned

22    about the accuracy of this report.  I've got evidence that

23    resides in this case that Officer Mitchell has made statements

24    that, I believe, are inaccurate.  And some more testimony in an

25    affidavit that was presented on a search warrant, and it's

1    relevant to Mr. King in that affidavit -- and this was an

2    affidavit that was given after this arrest and after this

3    interview -- that stated that Mr. King was found with cocaine

4    powder at the trap house when that's clearly not the case.  I

5    mean, by the time that affidavit was sworn out, the results

6    from the lab were already back and it was clear that the salt

7    shaker that Mr. King had in his pocket contained crack.

8            So I'm not here to say that Officer Mitchell

9    intentionally misled the Court or anyone else.  I'm saying that

10   there were a lot of people that were talked to, a lot of people

11   that were interviewed.  As I said earlier, I just got these

12   notes, and it appears to me that some of these notes may be a

13   compilation of more than one interview.  The notes are -- in

14   some portions, Mr. King is referred to in the third person,

15   sometimes in the first person.  I just think that it's worth

16   exploring the veracity of that interview.

17           THE COURT:  Well, I tell you what then, let's put

18   Officer Mitchell on the stand, and let's get some testimony

19   then.  If you'll have a seat at the table, I'll have

20   Ms. Greenwood to put him on the stand.

21           MS. GREENWOOD:  I appreciate the opportunity to clear

22   up any confusion there may be or any disparaging characteristic

23   of the veracity of this agent.

24           Investigator Mitchell.

25   GOVERNMENT'S WITNESS, RANDALL MITCHELL, SWORN.

1          THE CLERK:  Please state your name and occupation for

2     the record.

3          THE WITNESS:  Randall Mitchell.  I'm employed with

4     the Georgia Bureau of Investigation, sworn in as a task force

5     officer at the FBI.

6          THE CLERK:  All right.  Please have a seat.

7          THE WITNESS:  Thank you.

8          MS. GREENWOOD:  One moment, your Honor.  I'm sorry.

9          THE COURT:  That's all right.  Take your time.

10                    DIRECT EXAMINATION

11    BY MS. GREENWOOD:

12    Q    Agent Mitchell, were you involved in the

13    investigation of Derrick King and others in the conspiracy that

14    was charged -- that Mr. King was charged with in the

15    indictment?

16    A    Yes, ma'am, I was.

17    Q    What was your role in that investigation?

18    A    I was responsible for writing some of the affidavits

19    involved in the search warrant, the affidavit involved in the

20    eight search warrants that we executed on that day as well as

21    some of the interviews conducted on the suspects after the

22    search warrants were executed.

23    Q    And did you also -- on April 27th of 2009, seven or

24    eight search warrants were executed; is that correct?

25    A    Yes, ma'am, that is correct.

1      Q      And one of those search warrants were executed at the

2   trap house at 1941 Third Avenue; is that right?

3      A      Yes, ma'am.

4      Q      Were you involved in the search of that location?

5      A      No, ma'am, I was not.

6      Q      Did you recover any of the evidence in that case?

7      A      No, ma'am, I did not.

8      Q      Do you know who was leading up the evidence recovery

9   in that case?

10     A      Yes, ma'am.  I believe it was Special Agent Gytis

11  Zunde with the FBI.

12     Q      And where were you?

13     A      I was located at Mr. Beale's residence assisting in

14  the execution of that warrant.

15     Q      Was it important to execute these search warrants

16  simultaneously?

17     A      Very important, yes, ma'am.

18     Q      Why was that?

19     A      Phone activity, obviously.  If we were to execute one

20  warrant prior to the other ones, neighbors, people involved in

21  the case, relatives would place phone calls to the other

22  locations warning them that we were executing search warrants.

23  Evidence would be lost at that point.

24     Q      And, now, prior to this, there had been some phone

25  taps, wiretaps, authorized by the Court that were placed on the

1    phone of -- on two phones of Reginald Beale; is that correct?

2        A    Yes, ma'am, that's correct.

3        Q    And in the course of those recorded phone calls, did

4    you help monitor those phone lines?

5        A    Yes, ma'am, I did.

6        Q    And in the course of that, did you overhear

7    conversations between Reginald Beale and Derrick King which

8    would indicate both of their involvement in this drug

9    conspiracy?

10       A    Yes, ma'am.

11       Q    And in the course of that, did you hear evidence that

12   -- based on your investigation, and I know it wasn't limited to

13   the wiretap, it also included these controlled buys which

14   you've already heard some discussion of earlier today, correct?

15       A    Yes, ma'am.

16       Q    What was the primary narcotic that was being sold

17   during the course of this conspiracy?

18       A    Crack cocaine.

19       Q    Okay.  Was powder cocaine also being sold?

20       A    Yes, ma'am.  I believe it was.  It depended on the

21   clientele.

22       Q    And, in fact, was there some evidence of where

23   Reginald Beale was obtaining the powder cocaine?

24       A    I'm sorry.  Could you repeat that?

25       Q    Reginald Beale, was he the source of the powder

1    cocaine that these other individuals would get?

2    A    Yes, ma'am.

3    Q    And was he involved in cooking that up sometimes?

4    A    Yes, ma'am.  That's correct.

5    Q    Were others involved in the conspiracy involving

6    cooking up the cocaine?

7    A    Yes, ma'am.  Marsignor White was also involved in the

8    cooking of that.

9    Q    And was crack cocaine sold out of the trap house?

10    A    Yes, ma'am.

11    Q    And do you know this because of some of the

12    controlled buys that you all undertook?

13    A    That's correct.

14    Q    Now, after the search warrants were executed -- first

15    of all, do you know -- you weren't physically there to recover

16    the drugs from the trap house, correct?

17    A    Correct.

18    Q    Do you know what kind of drugs were recovered from

19    that house?

20    A    Yes, ma'am.  It was, I believe, powder cocaine, crack

21    cocaine.  I know we had prescribed syrup, codeine syrup, that

22    was involved in the case.  I'm not sure whether any of that was

23    recovered.  I believe bottles were recovered.  I'm not sure if

24    there was anything in the bottles at the time or if it was

25    already used.

1    Q    Okay.  And were you involved -- and do you know

2   whether or not Derrick King was located at that trap house when

3   all those drugs were found?

4    A    Yes, ma'am.  I know that he was arrested at the trap

5   house during the execution of the search warrant.

6    Q    You weren't involved in that arrest?

7    A    No, ma'am.  It was related to me and as well as

8   paperwork, obviously, that pertains specifically to that trap

9   house.

10    Q    Do you know who else was at that trap house?

11    A    I'd have to look at the paperwork.  Mr. King was

12   arrested there.  I believe Mr. Marsignor White was also there.

13   And I can't recall if Mark Jones was there.  But I know him to

14   be -- his name was the renter or owner of the residence.

15    Q    Okay.  And did there come a time -- were you involved

16   in the interview of Derrick King after his arrest?

17    A    Yes, ma'am, I was.

18    Q    And when did that take place?

19    A    I believe the same day of the execution of the search

20   warrant.  That afternoon.

21    Q    And who else was present?

22    A    Myself and intelligence analyst McCarthy Butts with

23   the FBI.

24    Q    Now, what was your role in the interview?

25    A    My role was to discuss what Mr. King had been charged

1   with and to advise him that we had substantial amount of

2   evidence linking Mr. King to the conspiracy and, obviously, to

3   get Mr. King's side of the story and his involvement in the

4   conspiracy.

5       Q    And this took place on April 27th?

6       A    Yes, ma'am.

7       Q    Now, did you take notes during that interview?

8       A    Yes, ma'am, I did.

9       Q    And did you provide those to me this morning?

10      A    Yes, ma'am, I did.

11      Q    Were these maintained as part of your regular

12  practice as a task force officer with the FBI?

13      A    I'd have to admit it was kind of new to me.  I had

14  been employed with the GBI for approximately nine years.  And

15  the GBI's policy, so to speak, is our notes and everything

16  about the notes are transferred to the document that -- the 302

17  or 2R summary in a narrative form.  Once everything is

18  transferred over, obviously, our notes are destroyed for the

19  purpose of not leaving them around offices and open record and

20  things like that.  So once all of the information is

21  transferred over on the GBI side, we actually destroy the

22  notes.

23              This case was my first case involved with the

24  FBI.  And I was told at some point during this case that the

25  FBI keeps the notes and puts them in what they call a 1-A.

1    It's basically an attachment in the case file for situations

2    like this, I would guess.

3            MS. GREENWOOD:  And, your Honor, normally notes are

4    not usually something that are discoverable, but I do have them

5    here today, and I think they may be instructive.  So although I

6    have some concern about having them out in public record, I

7    think to clarify any confusion, I think it would be beneficial

8    if we could introduce them as an exhibit at least to this

9    sentencing.

10           THE COURT:  Okay.

11   BY MS. GREENWOOD:

12      Q    So I'm going to show you what's been marked now as

13   Government's Exhibit Number 1.

14           MS. GREENWOOD:  May I approach?

15           THE COURT:  You may.

16   BY MS. GREENWOOD:

17      Q    And ask if you recognize this document.

18      A    Yes, ma'am, I do.

19      Q    And what is that?

20      A    This is a copy.  It's not the original, but it's a

21   copy of the notes I took on the date of the interview.

22      Q    That's your handwriting?

23      A    Yes, ma'am, I'm afraid so.

24      Q    And there's some portions of those notes that were

25   cut off during the copying process; is that correct?

1       A     That's correct.  Yes, ma'am.

2       Q     At the bottom of the page--

3             MS. GREENWOOD:  And if the Court would like the

4    original, just let us know.  But that's what we've got here

5    today.

6    BY MS. GREENWOOD:

7       Q     And then did you utilize -- when did you then

8    transcribe the report?

9       A     As we've all stated, there was a lot going on pretty

10   much from the time or prior to the execution of the search

11   warrants and thereon, documenting evidence and making sure we

12   had all our ducks in the row so to speak.  The date of the

13   transcriptions is showing May 4th, 2009.

14      Q     And then that would have taken the form of an FBI

15   302?

16      A     Yes, ma'am, that's correct.

17      Q     I want to show you what's been marked as Government's

18   Exhibit Number 2.  Do you recognize that?

19      A     Yes, ma'am.

20      Q     And what is that?

21      A     That's the FBI 302, the final document of the

22   interview, in a narrative form.

23      Q     Now, do you prepare that on your own?  Do you consult

24   with a co-interviewer when you prepare it?  How is that done?

25      A     My standard practice, if possible, or if feasible, if

1    we have the proper manpower, would be, obviously, to interview

2    somebody with two people.  Again, every agent has different

3    tactics in interviewing.  I would prefer two people because

4    during the interview when you're developing a repore with the

5    defendant or the victim, you're being -- talking to them.  And

6    sometimes you're not able to take notes at the same time you're

7    talking with an individual.

8         Q    Right.

9         A    So if we have two people interviewing, Mr. Butts

10   could take notes or I could take notes.

11        Q    Okay.  But when you're preparing the report the week

12   later--

13        A    Oh.

14        Q    -- the May 4th, is that something you do

15   independently?

16        A    Yes, ma'am.

17        Q    And do you rely on your notes to some extent doing

18   that?

19        A    Yes.  And consulting with Mr. Butts who was present

20   in the interview as well.

21        Q    And, in fact, your notes aren't a verbatim record of

22   the conversation; is that correct?

23        A    No, ma'am, not at all.  They're reminders of what was

24   said during the interview.

25        Q    And so when you're preparing the report, you're also

1    relying on your memory of what had just happened a few days

2    earlier?

3        A    As well as the reminders I put down, yes, ma'am.

4        Q    Okay.  And how long have you been in law enforcement?

5        A    I've been in law enforcement ten years now.

6        Q    Okay.  And how long have you been writing reports?

7        A    Ten years, at least ten years.

8        Q    Something you have to do on a regular basis?

9        A    All the time, yes, ma'am.

10       Q    And how long have you been involved in this

11   particular investigation?

12       A    I actually came in towards the tail end of this

13   investigation.  I was sworn in with the FBI, I want to say,

14   approximately January.  I don't have that exact date.  They had

15   already conducted several controlled buys that had taken place

16   at the beginning of this investigation.

17       Q    When you say the tail end, you came in in January of

18   2009?

19       A    I was sworn in then, yes, ma'am.

20       Q    Okay.

21       A    I can't remember.  They had already started this

22   case.  This case had already been going on previously before I

23   was introduced to the FBI as a task force officer.

24       Q    But you had been involved in it for at least a few

25   months?

1          A     Yes, ma'am, yes, ma'am.

2          Q     Were you involved the entire time that the wiretaps

3     were going on on the phones?

4          A     Yes, ma'am, I was.

5          Q     So although you may have come in somewhat late in the

6     process of the investigation, would you say -- how -- what was

7     your level of familiarity with the players?

8          A     Very familiar.

9          Q     Now, when you all spoke to Mr. King -- and I say you

10    all.  When you spoke to Mr. King with McCarthy Butts present,

11    did he make any admissions about the amount of drugs that he

12    was selling and from where?

13         A     Yes, ma'am.  He was cooperative to us to a certain

14    extent.  He admitted to selling the drugs.  And the only part

15    that I believe not to be accurate, and that was based on the

16    facts of the investigation and what we already knew through

17    intercepted phone calls, was where the cocaine was being

18    supplied by.

19         Q     And what did he tell you was the source of supply?

20         A     He advised that the source of supply was Mark Jones,

21    which was the owner/renter of the residence, of the trap house.

22         Q     And did you tell him there at the interview that you

23    didn't believe him?

24         A     Yes, ma'am, I did.  I told him that we were already

25    familiar with the source of supply.  Obviously, through the

1    phone calls, we knew the source of supply to be out of Atlanta,

2    Georgia.

3        Q    And what did he say in response to that?

4        A    He stuck to it.  He said that the cocaine was coming

5    from Mark Jones.  Other than that, though, Mr. King was

6    cooperative about his involvement in the conspiracy.

7        Q    Did he tell you anything about the nature of what

8    kind of drugs were being sold at the trap house?

9        A    Yes, ma'am, he did.

10       Q    What did he say?

11       A    He advised that the crack cocaine was the primary

12   narcotic sold out of the trap house and that the syrup, the

13   prescribed codeine syrup, and the prescription pills were

14   located at the trap house on a regular basis, but were sold

15   here and there every now and then, but were mainly used for

16   personal use.

17       Q    And is this consistent with what you all had found

18   during your investigation?

19       A    Very consistent.  Yes, ma'am.

20       Q    Did he provide you information about what quantities

21   of cocaine he was selling out of the trap house?

22       A    Yes, ma'am, he did.

23       Q    What did he say?

24       A    Mr. King gave us some historical information from him

25   being from Milledgeville.  I confirmed that with Mr. King

1   because I had a captain of the Milledgeville Sheriff's Office

2   advise me about Mr. King and his criminal activity in

3   Milledgeville.  So we discussed that for a little bit.  And so

4   Mr. King advised me that, from him being from Milledgeville, he

5   was somewhat labeled as an outsider in the Reginald Beale

6   organization.  Therefore, he didn't have the responsibility of

7   selling large amounts, or larger amounts I guess I should say,

8   at the ounce level of the crack cocaine.  Mr. King was

9   basically in charge of selling the nicks, which are basically

10  $5, $10, $20 crack rocks to what Mr. King referred to as

11  junkies or uncles.  Which, "uncles," that's the first time I

12  had heard that slang term used for a crack addict basically.

13      Q    Did he specifically say, I sold crack?

14      A    Yes, he did.

15      Q    And in the course of that, I mean, were there other

16  things that he said to you that would indicate to you that he

17  was selling crack cocaine?

18      A    Yes, ma'am.  He advised me that he sold -- it was an

19  approximate when we were talking about it.  But he sold

20  approximately a quarter to a half ounce of crack cocaine a day,

21  at small levels, to the crack addicts.

22      Q    And he called those folks junkies and uncles?

23      A    Yes, ma'am, that's correct.

24      Q    Do you know how long he had been staying at the trap?

25      A    We did briefly discuss that.  And Mr. King told me

1    that he started staying there on a permanent basis during, I

2    believe, the month of March.  But I don't think Mr. King knew

3    an exact time.  He was kind of going back and forth from

4    Milledgeville, and we did discuss transporting money.  We had

5    some intercepted phone calls where we believed there was money

6    being transported back to Milledgeville.  And we talked about

7    the amount of money.  He advised me, I believe 3 or 4,000

8    dollars was going back to Milledgeville.  It wasn't a large

9    amount of money.

10        Q    I guess it depends on who you ask.

11        A    Correct.  Correct.

12        Q    Now, did you also have a conversation, while we're

13   talking about it, about firearm usage by the defendant?

14        A    Yes, ma'am, we did.

15        Q    And what did you discuss in that regard?

16        A    We had had some intercepted phone calls during the

17   wire of Mr. King being in possession of a .45.  During one of

18   the phone calls, specifically, the .45 was described through

19   cuss words that I'll choose not to say right now, but as a very

20   big firearm, basically, with a couple of cuss words in there

21   with it.  So when myself and Mr. Butts interviewed Mr King, we

22   addressed that the firearm that, according to the conversation,

23   was revealed at a club, at a bar or a club.  And Mr. King

24   advised me that he didn't -- he did not show the firearm inside

25   of the club.  But that it was actually outside, before entering

1   the club.

2       Q    And do you know whether or not a .45 pistol was found

3   at the trap house where Mr. King was located during the search

4   warrant execution?

5       A    Yes, ma'am.  I was advised that a .45 was recovered,

6   a High Point .45, which is a large -- High Points are known to

7   be very large and bulky.

8       Q    Now, you, after -- anything else related to drug

9   quantities or type of drugs that were sold at the house that

10  when you were having conversations with Mr. King that was of

11  note?

12      A    I mean, we had a fairly lengthy interview so there

13  may be things that I'm missing.  Mr. King advised, which as I

14  said I believe to be inaccurate, that he was getting a quarter

15  ounce of cocaine from Mark Jones, as he stated for about $225.

16  We discussed prices a little bit.  I asked him how much he was

17  getting a half ounce for, and he advised me that he was getting

18  a half ounce for 375 to 400 dollars.  Which, through my

19  undercover experience, I know that to be consistent to the

20  amount of crack cocaine.

21      Q    Now, after this time -- and as you said, there were a

22  lot of different things going on.  You also -- or during the

23  course of these search warrants, various cell phones, cameras,

24  other electronic media were recovered and seized during the

25  search warrant execution, correct?

1        A    Yes, ma'am.  Several.

2        Q    And, in fact, several were recovered from the trap

3    house, right?

4        A    Yes, ma'am.

5        Q    And so a little while later, did you swear out an

6    affidavit in support of a search warrant to search all of those

7    cell phones?

8        A    Yes, ma'am, I did.

9        Q    And do you recall when that was?

10        A    No, ma'am, I don't.

11        Q    If you were -- well, would you recognize the search

12    warrant affidavit if you saw it?

13        A    Yes, ma'am, I would.

14             MS. GREENWOOD:  Your Honor, technically, this is

15    probably already part of the record because it's a court

16    document.  But, again, just out of an abundance of caution so

17    that our record is clear, I'm going to mark this Government's

18    Exhibit Number 3 and show it to the defendant if that's okay

19    with the Court.

20             THE COURT:  That's okay.

21             MS. GREENWOOD:  Thanks.

22    BY MS. GREENWOOD:

23        Q    Let me show you what's been marked as Government's

24    Exhibit Number 3.  Do you recognize that?

25        A    Yes, ma'am.

1      Q    And what is that?

2      A    It's an affidavit for the electronic devices that

3  were seized from the several different residences that we

4  conducted a search warrant on that day.

5      Q    And does it also include the actual search warrant

6  and the application for the search warrant?

7      A    Yes, ma'am.

8      Q    Okay.  And did you sign that affidavit?

9      A    Yes, ma'am, I did.

10      Q    And on what day was that signed?

11      A    On June 5th, 2009.

12      Q    Now, did you have personal knowledge of everything

13  that was included, the information that was included in that

14  affidavit?

15      A    No, ma'am.  I was supplied information from all seven

16  or eight residences.  Seven residences were from federal search

17  warrants.  The eighth residence was a state search warrant that

18  was involved in this conspiracy.  And information was provided

19  to me by law enforcement officers involved with each search

20  warrant.

21      Q    And, in fact, is there a paragraph in the affidavit

22  that states that this is not just based on your own personal

23  knowledge?

24      A    Yes, ma'am.

25      Q    Would you please read that to the Court.  What

1    paragraph is that?  I'll get it.

2         A    It's going to be Paragraph Six I believe.

3         Q    And what does Paragraph Six state?

4         A    It says, "I state that the information set out in the

5    affidavit is personally known to me or was furnished to me by

6    other law enforcement officers or sources involved in the

7    investigation.  I've not included every fact known to me

8    regarding this investigation, but only included those facts

9    that I believe to be necessary to demonstrate probable cause."

10        Q    Okay.  And then, if you could, turn to Paragraph Ten.

11        A    Okay.

12        Q    Does that relate to -- what does that paragraph

13   relate to?

14        A    This relates to the cellular telephones and

15   electronic devices that relate to Paragraph Ten Section A.

16   It's going to be the 1941 Third Avenue which is identified as

17   the trap house.

18        Q    And that's where Mr. King was?

19        A    Yes, ma'am.

20        Q    Now, the information that you have in here where it

21   says that Mr. King, and then it says:

22             Derrick King, AKA "Dirt" (possessing 2.5 grams

23   of cocaine.)

24        A    Yes, ma'am.

25        Q    Do you know where you got that information?

1        A        Obviously, at that time they hadn't received the lab

2    reports that state the exact net weight of the product.  And

3    actually, other than field tests, we don't have whether that

4    product was cocaine base and the amount.  So that would be an

5    approximate, if not an approximate from the law enforcement

6    officers that advised me what they found at the residence.

7        Q        So you would have gotten that information from

8    somebody else?

9        A        Yes, ma'am.

10        Q        Maybe somebody who was actually involved in what was

11    seized from that residence?

12        A        Yes, ma'am.

13        Q        And at that time, had you already been told that

14    Mr. King was found with some cocaine on him?

15        A        Yes, ma'am.  I had been told that he had -- that

16    there was cocaine in a salt shaker that was on him.  That was

17    all that I was told.

18        Q        Did you know at that time whether that was crack or

19    powder?

20        A        At the time, no, ma'am.  I wasn't familiar with it

21    until I read the paperwork and was told it was crack cocaine.

22        Q        And in here you just reference it as cocaine; is that

23    correct?

24        A        Yes, ma'am.

25        Q        No distinction between crack or powder?

1          A     No, ma'am.

2          Q     Now, later in this same paragraph, you indicate

3     larger quantity of drugs that were recovered from the trap

4     house; is that correct?

5          A     That's correct.

6          Q     And how do you describe that?

7          A     I've got:

8                Other relevant evidence seized at the premises

9     was as follows:  3.6 ounces of crack cocaine; one loaded

10    .45-caliber handgun; two boxes of ammunition labeled .40

11    caliber and .22 caliber; video surveillance equipment; aerosol

12    cans with false bottoms, hidden compartments; and five sets of

13    digital scales.

14         Q     And do you know where you would have gotten that

15    information?

16         A     From the officers that were involved in executing

17    that search warrant.

18         Q     Did you do any personal investigation at that time

19    about the accuracy of these particular quantities?

20         A     No, ma'am.

21         Q     Is that unusual?

22         A     No, ma'am, not with eight execution -- search

23    warrants being executed that day.  We were relying upon team

24    work.

25         Q     Now, I want to show you what I am marking as

1    Government's Exhibit Number 4.

2              MS. GREENWOOD:  May I approach?

3              THE COURT:  You may.

4    BY MS. GREENWOOD:

5         Q    Do you recognize that?

6              MS. GREENWOOD:  I've got an extra copy if the Court

7    would like one.

8         A    Yes, ma'am.

9         Q    What is that?

10        A    This is going to be lab report involving the drugs

11   that were seized from the residence.

12        Q    Okay.  And you didn't prepare this document?

13        A    No, ma'am.

14        Q    Are you familiar with this type of document from the

15   work you've done?

16        A    Yes, ma'am.

17        Q    And there are some handwritten notes on this

18   document.  Do you know whose those are?

19        A    No, ma'am, I don't.

20        Q    Do they indicate where these particular narcotics

21   were recovered during the course of this investigation?

22        A    Yes, ma'am, it appears that way.

23        Q    And what do they indicate?

24        A    The bottom three labels are handwritten next to it

25   saying trap.  And then the top one is Rug, who was known as

1   Reginald Beale.  And the second one is Dirt who is also -- is

2   Derrick King.

3      Q   Okay.  And, in fact, the one that says Dirt has a

4   date under it; is that correct?

5      A   Yes, ma'am.

6      Q   And what's that date?

7      A   April 27th, 2009.

8      Q   And what does it state out beside that?

9      A   It has cocaine base.

10      Q   No.  In handwriting.

11      A   I'm sorry.  That says Dirt, April 27, 2009, salt

12   shaker.

13      Q   And that wound up being cocaine base upon testing?

14      A   Yes, ma'am, according to the lab report.

15      Q   What was the gross weight?

16      A   The gross weight was 84.1 grams.

17      Q   And the net weight?

18      A   The net weight was .99 grams.  It was just under a

19   gram.

20      Q   What might cause that disparity between the gross

21   weight and the net weight?

22      A   The gross weight is the entire package.  That would

23   have included the salt shaker.  The net weight was where the

24   labs documented the exact weight of the cocaine base.

25      Q   And then there was other cocaine base that was

1    located in the trap including 56.4 grams of net weight,

2    correct?

3         A    Yes, ma'am, correct.

4         Q    With the gross weight of 221 grams?

5         A    Yes, ma'am, that's right, including the packaging.

6         Q    Now, can you tell by looking at that document when it

7    was signed off on by the folks at the lab?

8         A    It looks like it was approved on June 30th, 2009.

9         Q    And, again, the search warrant affidavit that you

10   swore out was sworn out on June 5th?

11        A    Yes, ma'am, that's correct.

12        Q    Twenty-five days before this report was completed?

13        A    Correct.

14        Q    Did you actually submit these drugs to the lab

15   yourself?

16        A    I don't -- no, ma'am.  I don't believe I was the one

17   that submitted these.  It is more than likely the officer that

18   maintained possession of the drugs from the search warrant.

19        Q    And do you notice an exhibit number in front of or

20   related to the narcotics that are listed there with the name

21   Dirt next to it?

22        A    Yes, ma'am.  Exhibit Number 1B, as in bravo, 26,

23   1B26.

24        Q    And then what exhibit number is labeled on the items

25   from the trap?

 1    A    It's going to be 1B27.01, 1B27.02 and 1B27.03.

 2    Q    I want to show you --

 3         MS. GREENWOOD:  One moment, your Honor.

 4         May I approach, your Honor?

 5         THE COURT:  You may.

 6  BY MS. GREENWOOD:

 7    Q    I want to show you what's been marked as Government's

 8  Exhibits 5 and 6.  Do you recognize those documents?

 9    A    Yes, ma'am.

10    Q    Have you ever seen those documents before?

11    A    When you showed them to me this morning.

12    Q    Have you ever seen these before this morning?

13    A    No, ma'am.

14    Q    Do you know what they are?

15    A    I'm still slowly trying to get the hang of the FBI

16  paperwork from the GBI side.  But it appears to be paperwork

17  that labels the documenting evidence coming from each location.

18    Q    So a, perhaps, something having to do with a chain of

19  custody?

20    A    Yes, ma'am.

21    Q    And, first, looking at Government's Exhibit Number 5,

22  does it have a category at the top with a number similar to

23  what you found on the drug report?

24    A    Yes, ma'am.

25    Q    And what's that?

1       A    1B26.

2       Q    Okay.  And who -- can you tell who acquired that

3    item?

4       A    Yes, ma'am.  It was Special Agent Gytis Zunde with

5    the FBI.

6       Q    Does it have a time?

7       A    Excuse me?

8       Q    Time for the acquisition?

9       A    Yes, ma'am.  On April 27th, 2009 at 6:30 a.m.

10      Q    Is that consistent with when you all were executing

11   your search warrants?

12      A    Yes, ma'am.

13      Q    Does it indicate who this item was acquired from?

14      A    Derrick King.

15      Q    And at what location?

16      A    1941 Third Avenue also known as the trap house.

17      Q    Now, on the next page, does it also indicate what was

18   recovered from him?

19      A    Yes, ma'am.

20      Q    And what was that?

21      A    Description is a small white rocklike substance

22   contained in a salt shaker, suspected cocaine.

23      Q    And then does it have a drug weight listed on that

24   same page?

25      A    Yes, ma'am.

1      Q     Of what?

2      A     87.5 grams.

3      Q     But you had never seen this document before?

4      A     No, ma'am, not before today.

5      Q     And when you prepared your search warrant affidavit

6    with regard to the cell phones, you relied on the individuals

7    who had recovered the evidence to give you the information

8    about how much drugs was recovered from each individual person

9    and place; is that right?

10     A     Yes, ma'am.

11     Q     Now, if you would also look at Exhibit Number 6, what

12   category were exhibit numbers listed there?

13     A     Categories 1B, as in bravo, 27.

14     Q     And is that recovered from that same individual and

15   same location as 1B26 reflected in Exhibit 5?

16     A     Yes, ma'am, from Derrick King from 1941 Third Avenue,

17   known as the trap house.

18     Q     And in this report it lists several items on the

19   second page that were recovered; is that correct?

20     A     Yes, ma'am.

21     Q     Including a bag containing an off-white substance

22   weighing 27.5 grams and a bag containing an off-white substance

23   weighing 34 grams; is that correct?

24     A     Yes, ma'am.

25     Q     Two clear bags.  One with white powder, the other

1  with an off-white, rocklike substance weighing 63 grams?

2       A    Correct.

3       Q    And then there's another thing listed, clear plastic

4  bag containing off-white, rocklike, and then it stops; is that

5  correct?

6       A    Yes, ma'am.

7       Q    Okay.  Is it possible there were other things that

8  were recovered and they didn't all print out on this sheet?

9       A    It looks that way, yes, ma'am.

10      Q    What is the total drug weight that is listed on that

11  page?

12      A    Total drug weight is 227.5 grams.

13      Q    Now, in your report -- I mean, in the search warrant

14  affidavit, you had listed 3.6 ounces of crack cocaine recovered

15  from the trap house; is that correct?

16      A    Yes, ma'am.

17      Q    About how many grams would that be?

18      A    It would be 28 times 3 and then add .6 to it.  So

19  half of 28, obviously, add up about 14 grams.  So 28 times 3,

20  plus 14.

21      Q    So 90-some-odd grams?

22      A    Yes, ma'am.

23      Q    A lot less than the 227.5 listed just for Exhibit

24  1B27, correct?

25      A    Correct.

1      Q     When you add up -- when you look at the drug report

2  for what was recovered from the trap house, it's got some

3  amount that was powder cocaine, correct?

4      A     Yes, ma'am.

5      Q     27.7?

6      A     Correct.

7      Q     And then it had another .73 grams that was powder,

8  correct?

9      A     Yes, ma'am.

10     Q     Wait.

11     A     Wait a minute.

12     Q     .73, the next to the last entry.  This is in exhibit,

13 I think it's Exhibit 4.  Then it has 56 grams .4 grams of crack

14 cocaine, correct?

15     A     The white, rocklike substance at 63?

16     Q     I'm sorry.  I'm looking at the lab report.

17     A     Oh, okay.  I'm sorry.  Let me look at that.  Yes,

18 ma'am, 56.4.

19           MS. GREENWOOD:  Your Honor, I think I've provided

20 enough testimony to cover, hopefully, most, if not all, of the

21 other objections.  I know that the Court mentioned at the

22 beginning of this hearing two objections.  I'm not sure if the

23 Court is aware that the defendant wrote a letter which listed a

24 number of other objections, some of which maybe has been

25 covered by some of this testimony.  I don't know if the Court

1    intends to get into those or not.

2              THE COURT:  No.

3              MS. GREENWOOD:  Okay.

4              THE COURT:  I do not.

5              MS. GREENWOOD:  Okay.  Thank you.

6              THE COURT:  Mr. Enoch, did you have a few questions

7    for Investigator Mitchell?

8              MR. ENOCH:  Yes, sir, your Honor.

9                        CROSS-EXAMINATION

10   BY MR. ENOCH:

11        Q    Investigator Mitchell, I'm Edward Enoch.  I'm

12   Mr. King's attorney.

13        A    Yes, sir.

14        Q    I know that that lab report of numbers was somewhat

15   hard to follow through.  At least it was for me.  But I think

16   what I took out of that, I want to go back to the affidavit

17   that you swore out.  I think it's Government Number 3.

18        A    Okay.

19        Q    Clear up just a couple of things.  It appears that

20   this was sworn out on June 5th, 2009; is that correct?

21        A    That's correct.

22        Q    I believe in your testimony you made a comment that

23   this was one of many that were sworn out that day.  But, in

24   fact, I think you may have been thinking about the one sworn

25   out on April 27th?

1  A   The search warrant on the federal side was seven

2  residences, all in one search warrant.  And then the eighth

3  residence was a state warrant with Richmond County Narcotics

4  involved with that.

5  Q   But those were done in April, late April; were they

6  not?

7  A   Obviously prior to the search warrant executed on the

8  27th.  Yes, sir.

9  Q   So this search warrant would not have been part of

10 that big package of warrants?

11 A   No, sir.

12 Q   Because it was done a couple of months later?

13 A   This was done, yes, sir, basically for the cellular

14 devices.

15 Q   That were seized as part of that?

16 A   Correct.  Yes, sir.

17 Q   So referring to Paragraph Six that Ms. Greenwood

18 directed you to at the beginning of your testimony about this

19 affidavit, whose responsibility is it to make sure that the

20 information that's presented in this affidavit is accurate?

21 A   It's mine.

22 Q   So when there's a specific narrow detail given in

23 this report, it would be on your shoulders to make sure that

24 that was accurate?

25 A   Yes, sir.

1    Q    So looking at Paragraph 10A, you clearly do draw a

2    distinction between cocaine and crack cocaine.  You refer to

3    the amount that Derrick King possessed as two-and-a-half grams

4    of cocaine; is that correct?

5    A    Correct.

6    Q    Do you follow me?

7    A    Right.

8    Q    And then, as Ms. Greenwood has gone through, you

9    indicate farther in that paragraph, 3.6 ounces of crack

10   cocaine.  In my rough math, that works out to be about a

11   hundred grams?

12   A    Twenty-eight times three plus, roughly, 14 is,

13   approximately, yes, sir.

14   Q    I want to direct you to Government's Number 5 and 6

15   that you were just discussing with Ms. Greenwood.  The

16   Government's Number 5 is the salt shaker containing a small

17   white, rocklike substance.  According to this report, it was

18   acquired by Derrick King, if I'm reading that correctly on the

19   front page.  What was the drug weight assigned to that?

20   A    Which one are you talking about?

21   Q    I'm talking about Government's Number 5 if I have

22   them labeled correctly.  This is category 1B26.

23   A    Is that going to be the crime lab report?

24   Q    The crime lab report.  No, that's going to be -- I

25   think this is the chain of custody report.

1        A    1B26.

2        Q    1B26.  I've got it marked as Government's Exhibit

3    Number 5.

4        A    Okay.

5        Q    And the description on Page Two of Three is a small,

6    white, rocklike substance contained in a salt shaker?

7        A    Yes, sir.

8        Q    And this was according to the chain of custody

9    acquired from Derrick Ring which is listed on that front page.

10   So can you tell me whether the drug weight that they issued in

11   this custody report was, as I read it, was 87.5 grams on Page

12   Two of Three?  Are you following me?

13       A    I'm trying.  Yes, sir, 87.5.

14       Q    87.5 grams of a white, rocklike substance.  But the

15   report -- or the affidavit specifically assigns to Mr. King

16   two-and-a-half grams of cocaine.  Those numbers seem off by a

17   power of ten.

18       A    Again, I wasn't the one who did the chain of custody

19   here.  But assuming, based on the numbers that you and I are

20   looking at, that the agent involved in this weighed the salt

21   shaker as well as the crack cocaine.

22       Q    I would have guessed that myself.

23       A    I'm just going by what you and I are looking at.  I

24   wasn't there during that weighing in.

25       Q    And because what I'm trying to get is I'm trying to

1   figure out is where the affirmative statement that Mr. King was

2   holding two-and-a-half grams of cocaine, where that information

3   comes from.  We've already established that the drug report,

4   the lab report, was not back when you made this affidavit.

5        A    Right.

6        Q    We didn't know what--

7        A    Right.

8        Q    -- weight the drugs were.

9             MR. ENOCH:  May I approach, your Honor?

10            THE COURT:  You may.

11   BY MR. ENOCH:

12        Q    I've marked this Exhibit 3.  Can you identify this

13   document for me?

14        A    Yes, sir.  It looks to be a FD302 concerning -- that

15   was written by Gytis Zunde with the FBI concerning the

16   execution of the search warrant at the trap house 1941 Third

17   Avenue.

18        Q    All right.  Have you seen this document before?  Are

19   you familiar with it?

20        A    I've briefly looked at it this morning, yes, sir,

21   with Ms. Greenwood.

22        Q    All right.  And so it appears to be a time line of

23   the events in the execution of the warrant on Page One, a list

24   of the people who were at the residence at the time of the

25   warrant.  Turning to Page Two, let me direct you to the very

1   bottom of Page Two on over to Page Three.  Just take a moment

2   and read that.  And tell me what you interpret that to be.

3        A     You want me to read it out loud?

4        Q     You don't have to.  I mean, we all have a copy of it.

5   Are you familiar with it now?  Does this appear to be the salt

6   shaker that was -- the inventory of the salt shaker that was

7   taken?

8        A     Yes, sir, that's what it appears to be.

9        Q     And there's no weight here either, is there?

10       A     No, sir.

11       Q     So after we've reviewed all the documents that the

12   government could come up with as to how this quantity of

13   two-and-a-half grams of cocaine came to, we don't find anything

14   that actually says that there was -- he possessed

15   two-and-a-half grams of cocaine; is that correct?

16       A     No, sir.  As we stated in earlier testimony, you

17   know, the approximate weight of what looked like was in the

18   salt shaker at the time until the lab report was to come back

19   to us -- I mean, it all depends.  You could also write the

20   report in a complete different way, and I could have put, you

21   know, Derrick King was in possession of all of the drugs that

22   we located in the residence.  Which, I obviously didn't do.

23   But...

24       Q     Well, I guess that's what I was trying to get at.

25       A     I understand.

1      Q     Why the very specific fact?  Because I think the

2   issue that we're trying to get to here is the very specific

3   facts, not in this affidavit, but that were in the FBI report,

4   which then become the drug quantity qualification used by the

5   PSI report.  And so I'm trying to get to where specific facts,

6   how specific facts get to where they are.

7      A     Yes, sir.

8      Q     Let me turn to the FBI report that you -- of your

9   interview with Mr. King.  And that is Government's Exhibit

10  Number 2.  And I know that Ms. Greenwood has already been over

11  this with you in some depth.  In looking at and reading this

12  report and then comparing it with the notes that we just got

13  this morning, it appears to me that there are a number of

14  statements as fact that don't -- aren't corroborated by your

15  notes.  Some of the -- for instance, looking at the third

16  paragraph of the first page, toward the bottom of that

17  paragraph, there's a discussion of a gang activity, some

18  shooting.  Are you following where I'm at?

19     A     Where Mr. King was claimed to Blood by Jonathan

20  Smith, Granddaddy Lowe.

21     Q     Actually, I'm looking farther into that paragraph

22  where it talks about being involved in a shooting and--

23     A     Yes, sir.

24     Q     -- there being subsequent quarrels in the community.

25  I didn't see -- and I understand that your notes are not

1    entirely everything that was said in the interview.

2        A    Right.

3        Q    But I wondered, I know you said that you had already

4    spoken to folks in Milledgeville--

5        A    Yes, sir.

6        Q    -- about his criminal history and about his activity

7    in Milledgeville?

8        A    Yes, sir.

9        Q    Is that correct?

10       A    That's how we were able to identity, obviously, on

11   the intercepted phone calls the nickname of Dirt or Dirty Red

12   was mentioned several times.  During one of those intercepted

13   phone calls, he started claiming that he was from

14   Milledgeville.  I had contacts in Milledgeville, law

15   enforcement contacts when I worked undercover.  And I called

16   Mr. Brad King; he's the captain of the sheriff's office.  And

17   they were very familiar with the name of Dirty Red or Dirt and

18   they gave me the historical information, as I stated earlier

19   with Ms. Greenwood, concerning his criminal activity in

20   Milledgeville.

21            During the interview, you know, the notes --

22   it's not on the notes, probably, because I was already very

23   familiar with the criminal activity, already talking to law

24   enforcement there.  And myself and Mr. Butts confirmed, of what

25   Mr. King provided to me, of what was true and what was not

1  true.

2      Q    And so it would be your testimony that what's

3  incorporated into this report is the facts as they were told to

4  you by Derrick King?

5      A    And Captain Brad King as well.  Provided me facts,

6  and then I, in turn, told those facts to Derrick to let me know

7  whether that was true or false.  And he advised me that the

8  majority of what I had been told was true.

9      Q    That's really where I was trying to boil down to.  Is

10 this a summary of information that you had gathered or is it,

11 as it states in the report, King provided this information?

12     A    It was -- it depends on how you want to look at it.

13 It was information that was provided to me in the past.  And

14 Mr. Derrick King and I discussed it in the interview, and he

15 confirmed it to be true.  Therefore, providing information.

16     Q    So, for instance, he provided you the information

17 that he was able to "beat" an aggravated assault charge?

18     A    "Beat" I've got in a quote because that was his

19 quote, yes, sir.  That wasn't my word.

20     Q    Let me turn to the notes that you took that's

21 Government's Exhibit Number 1.  At the very top of these notes,

22 there's something that is obliterated.  Could you, since this

23 is your handwriting, could you tell me what was there?

24     A    No, sir.  I have no idea.  That might have been

25 something that I started taking notes at a later date or

1    earlier that day, and I crossed it out to start this interview.

2    I can't recall.

3         Q    And that's fine.  The reason I ask is because it

4    appeared in your note taking that Mr. King is referred to

5    sometimes in the first person, sometimes in the third person.

6    I direct you to the tenth point from the top.  Would you read

7    that one?

8         A    The tenth point from the top you said?

9         Q    Starting at the top, counting down ten.

10        A    I sell nicks.  The profit goes to Dirt.

11        Q    So are you saying that -- whose sells nicks?

12        A    Again, this is just shorthand type of note taking.

13   But during the interview, obviously, if Derrick King advised me

14   of something and I thought it to be pertinent, I put exactly

15   what he said, which is probably why I wrote, I sell nicks.

16   Which is something that he put.  Now, in my report I obviously

17   didn't put that as a quote.  I probably could have, but I'm not

18   going to put a quote unless I know it to be one hundred percent

19   accurate.  But if you look at the notes, if you're referring to

20   a first person and third person, as you stated, the ones that

21   were in first person were probably exact words that Mr. King

22   provided us.  And I believed them to be pertinent and

23   important, so I wrote the exact words that he said.

24        Q    All right.  So it's not possible in your mind that

25   this was notes from more than one interview?

1      A     No.  No, sir.  This is all pertaining to Mr. King

2  without a doubt.  Also nicks are obviously a slang term for $5

3  rocks, nickel, $5 rocks.  So I wrote the exact slang term that

4  he used.

5            MR. ENOCH:  May I have just a moment, your Honor, to

6  confer with my client?

7            THE COURT:  I tell you what, while we do that, I need

8  to take about a two-minute recess.  I'll be right back.

9                         (AFTER RECESS)

10            THE COURT:  Okay.

11            MR. ENOCH:  Just another moment, if you would, your

12  Honor.

13            THE COURT:  That's fine.

14            MR. ENOCH:  I have no further questions for this

15  witness.

16            THE COURT:  You have no further questions?

17            MR. ENOCH:  No.

18            THE COURT:  All right.  Do you have any follow-up,

19  Ms. Greenwood, at all?

20            MS. GREENWOOD:  Just one follow-up question, your

21  Honor.

22                      REDIRECT EXAMINATION

23  BY MS. GREENWOOD:

24      Q    When you asked other investigators what quantity of

25  drugs were located at the trap house, including what was found

1   off of Derrick King, were those individuals who you believed

2   would have the best knowledge about those drug quantities?

3       A    Much more than me.  Yes, ma'am.

4       Q    I'm sorry?

5       A    Much more than me.  Yes, ma'am.

6            MS. GREENWOOD:  Did y'all get that on the record?

7            THE CLERK:  Say that again.

8       A    Much more than I was myself.  Yes, ma'am.

9       Q    Okay.  And, I mean, these were individuals who were

10  involved in the investigation?

11      A    Correct.

12           MS. GREENWOOD:  Okay.  That's all I have.

13           THE COURT:  All right.  Then you are excused.

14           THE WITNESS:  Thank you, sir.

15           THE COURT:  Thank you, Investigator Mitchell.

16           THE WITNESS:  Do I leave those up here, Judge?

17           THE COURT:  You may leave those right there.  That

18  would be fine.  Thank you.

19           MS. GREENWOOD:  And, your Honor, I haven't actually

20  admitted or tendered for admission any of those documents.

21  Because, frankly, personally, I'm not sure they're necessary

22  for what the Court is doing.  But I guess out of thoroughness

23  in case this is something that is going to wind up back, you

24  know, before a Court or before the Eleventh Circuit, I would go

25  ahead and ask that they be admitted into evidence just to

1    complete the record.

2              THE COURT:  Any objection?

3              MR. ENOCH:  No, sir, your Honor.

4              THE COURT:  They're admitted then.

5              MS. GREENWOOD:  I don't know if he wants his Exhibit

6    3 admitted.

7              MR. ENOCH:  I ask that we admit all of them.

8              THE COURT:  All right.  No objection?

9              MS. GREENWOOD:  No objection.

10             THE COURT:  All right.  It's admitted.

11             MS. GREENWOOD:  Thank you.

12             THE COURT:  Okay.  Mr. Enoch, you and Mr. King can

13    return to the lectern then.

14             The Court has been considering the objection raised

15    by the defendant to the drug quantity attributed to the

16    defendant in Paragraph 18.  The Court has listened to the

17    argument of counsel, has listened very carefully to the

18    testimony of Investigator Mitchell of the GBI and of the

19    task -- drug task force.  The Court has reviewed the exhibits

20    entered into evidence by the parties.  And based upon that

21    evidence, the Court finds that by a preponderance of the

22    evidence that the defendant, Mr. King, admitted to the sale of

23    approximately a quarter to a half an ounce of cocaine base per

24    day.  And, therefore, that the calculation made by the

25    probation office is reasonable and correct for purposes of this

1  sentencing.  And, therefore, the objection is overruled.

2      The Court further finds that the resolution of this

3  objection, whichever way, has no impact on the guideline range

4  for imprisonment in this particular case because the defendant

5  is an armed career offender.  Okay.

6      MR. ENOCH:  Your Honor, if I may?

7      THE COURT:  You may.

8      MR. ENOCH:  I believe you just recited that he's a

9  armed career offender?

10      THE COURT:  A career offender.  I'm sorry.  I did

11  misstate that.  He is a career offender.  I correct that.  As a

12  result of the Court's findings, then, the Court hereby adopts

13  the factual statements contained in the Presentence Report as

14  its factual statements as its findings of fact.  Further, the

15  Court hereby adopts the probation officer's conclusions as to

16  the applicable advisory guidelines.

17      I do note that the final guidelines set forth in the

18  Presentence Report takes into account a full three-point

19  reduction for acceptance of responsibility.

20      Ms. Greenwood, are you going to move for the third

21  point under Sentencing Guideline Section 3E1.1(b)?

22      MS. GREENWOOD:  Your Honor, I am.  But -- I know I

23  brought this up earlier.  I just -- I guess I want to make sure

24  that the record is clear.  It's my understanding that the

25  defendant himself provided a number of objections.

1          THE COURT:  At the last minute.

2          MS. GREENWOOD:  Right.  Within the last week or so to

3     the probation office that I have received a copy of.  And I

4     just want to understand what the Court's ruling is with regard

5     to those objections.

6          THE COURT:  All right.  Mr. Blevins, would you hand

7     me that handwritten letter please.

8          MR. BLEVINS:  The letter?

9          THE COURT:  Yes.

10          MS. GREENWOOD:  And, again, many if not all of those

11     objections -- none of those objections, I believe, have

12     anything to do with the guidelines calculation because this

13     defendant is a career offender.  Except that he did object to

14     his characterization as a career offender.

15          THE COURT:  I understand.  Well, out of an abundance

16     of caution, then, Mr. Blevins, do you want to respond to these

17     objections?

18          MR. BLEVINS:  I'll be glad to, your Honor.  Your

19     Honor, I received this letter that Mr. King mailed to the Court

20     on March 29, 2010.  And if we could just admit this letter into

21     the record, I would like to refer to each paragraph instead of

22     reading each word in his letter.  If I could just refer to the

23     paragraph that it refers to, I think that would save some time,

24     your Honor.  With respect to the objection that he raises --

25     and I'm going to call these concerns because they were not

1    official objections because they were not submitted in a timely

2    manner.

3              And I would add, before I start, your Honor, me and

4    Mr. Enoch spent two hours after I disclosed this initial

5    report, and we resolved many, many objections in this case.  He

6    and I both worked diligently.  And most of our -- most of the

7    solutions that we reached were in favor of the defendant.  So

8    these concerns that he's raised, I'll address one by one, your

9    Honor.

10             Regarding Paragraph Seven, that's just a matter of

11   syntax.  It has no impact on the guidelines.  I just mentioned

12   his name in the report.

13             With respect to Paragraph Ten, that is a factual

14   issue which I believe to be accurate.  The 12 ounces of cocaine

15   hydrochloride was not attributed to the defendant as stated in

16   Paragraph 19.  Therefore, that issue has no impact on the

17   guidelines.  And also, due to his career offender status, that

18   issue has no impact on the guidelines.

19             With respect to--

20             MR. ENOCH:  May I, your Honor?

21             THE COURT:  You may.

22             MR. ENOCH:  As to Line Ten, the issue was stating

23   that phone conversation as fact of the involvement.  I think --

24   I've discussed it with both the probation officer and

25   Ms. Greenwood that if the Court were to order a revision of

1    that to say that it is the agent's interpretation that that

2    conversation indicated involvement, that there would be no

3    other objection in that to that paragraph.  Rather than stating

4    it as fact, just simply stating that that's the agent's

5    interpretation that that is what that conversation is about.

6              MR. BLEVINS:  I have no opinion as to that.

7              THE COURT:  You have what?

8              MR. BLEVINS:  I have no opinion as to that.

9              THE COURT:  You have no opinion.  Let's move on.  You

10   said as to that issue, there is no impact on the guidelines.

11             MR. BLEVINS:  That's correct, your Honor.

12             With respect to the concern that Mr. King raised in

13   Paragraph 15, this was a subject of objection that was resolved

14   between myself and Mr. Enoch.  I removed some wording regarding

15   that issue.  And what remains is what was agreed upon between

16   myself and Mr. Enoch.  The issue has no impact on the advisory

17   guidelines, your Honor.

18             With respect to Paragraph 16, that is a factual issue

19   which I believe to be accurate.  Due to his career offender

20   status, there is no impact on the guidelines.

21             Regarding his last argument on that page regarding

22   the discovery material, the government provided discovery

23   material to the defendant and to the probation officer as is

24   done in almost every case that's prosecuted in this court, your

25   Honor.  The probation office relies heavily on the information

1   provided to us by the prosecution.  And it is not a violation

2   of any law or policy for me, as a probation officer, to

3   consider documents that are provided to us in writing these

4   reports.  And that issue has no impact on the guidelines

5   either, given the Court's ruling earlier today regarding the

6   drug quantities.

7            Regarding Paragraph 24, that is a factual issue which

8   was also the subject of an objection which was resolved by

9   myself and Mr. Enoch.  Mr. King told me during my interview

10  with him that he knew a .38 revolver was in the trap house, but

11  he did not know the .45 caliber was in the trap house.  There

12  was only one firearm found by the agents on April 27th, 2009.

13  That was a .45 caliber.  Therefore, defense counsel and I

14  resolved that issue by stating, that Mr. King was aware that a

15  firearm was present at the trap house.  The caliber is,

16  frankly, irrelevant.  And due to his career offender status, it

17  has no impact on the guidelines.

18            MS. GREENWOOD:  Your Honor.

19            THE COURT:  Yes, ma'am.

20            MS. GREENWOOD:  If I can add, we've also heard

21  testimony today from Investigator Mitchell about the

22  defendant's prior use and knowledge of this .45 in

23  conversations between coconspirators related to that .45.  So I

24  think that there is certainly sufficient evidence to suggest

25  that even if he did not readily admit that to probation at the

1    time that he met with the probation office, that he was

2    certainly aware of a .45, had possessed a .45 during the course

3    of this conspiracy.  And as the Court is aware and as the

4    previous testimony has shown, that there is ample evidence of

5    firearm usage throughout this conspiracy which would attribute

6    him with the two points that he is attributed with.  Granted,

7    because he's a career offender, it's not relevant, but I think

8    it's important for the record to be clear on that point.

9              THE COURT:  Okay.  Go right ahead, Mr. Blevins.

10             Thank you.

11             MR. BLEVINS:  Yes, with respect to Paragraph 27, the

12   firearm that was found -- I'm sorry.  The firearm was found as

13   noted in Paragraph 14, therefore a two-level enhancement is

14   appropriate to be applied.  This issue was also related to

15   another objection which I and defense counsel addressed and

16   resolved.  Due to his career offender status, it has no impact

17   on the guidelines.

18             With regard to Paragraph 29, due to his career

19   offender status, it has no impact on the guidelines.

20             With respect to Paragraph 32, I believe the paragraph

21   is correct and supported by the Criminal History Section in the

22   PSI.

23             With respect to Paragraphs 37 and 38, each of those

24   offenses were scored separately due to there being an

25   intervening arrest.  The issue is moot due to his career

1   offender status.

2            With respect to Paragraph 39, as a factual issue, I

3   obtained this information by letter from the Middle District of

4   Georgia, and I have no reason to doubt its accuracy.  I have

5   copies of a court order dated December 14, 2007, regarding

6   Docket Number 39063.  No criminal history points were assigned

7   to the conviction, and the issue is moot due to his career

8   offender status.

9            With respect to Paragraph 41, I had a copy -- I have

10  a copy of that sentence.  And the issue is moot due to his

11  career offender status.

12           Regarding Paragraph 42, that is a factual issue.  I

13  obtained documentation from the Middle District of Georgia.  I

14  have no reason to doubt its accuracy.  The issue is moot due to

15  his career offender status.

16           With respect to Paragraph 44, two points were

17  assigned to that sentence under U.S.S.G. Section 4A1.1(b).  And

18  the issue is moot due to his career offender status.

19           With respect to Paragraph 48, there is a report that

20  I obtained from Baldwin County Sheriff's Office which indicates

21  he was arrested August 21, 2007, and released December 14,

22  2007.  And the issue is also moot due to his career offender

23  status, your Honor.

24           THE COURT:  Thank you.

25           MR. BLEVINS:  Yes, sir.

1            THE COURT:  Any response?  Ms. Greenwood, any

2   response?  Mr. Enoch?

3            MR. ENOCH:  Other than the initial response and

4   objection.

5            THE COURT:  Okay.  Ms. Greenwood?

6            MS. GREENWOOD:  No, I don't have any response.

7            THE COURT:  Okay.  Well, based upon the review of the

8   concern, the defendant's concerns, that were filed outside the

9   period for objecting to the PSI, the Court has considered those

10  concerns, had previously read through those concerns, and

11  concludes that the concerns are overruled and hereby disposed

12  of due, in no small part, to the fact that they have no impact

13  on the guidelines due to the career offender status of the

14  defendant.

15           In some cases, the Court finds by a preponderance of

16  the evidence that the facts set forth in the Presentence

17  Report, which are the subject of the concerns, are correct.

18  And in some cases, according to the probation officer's

19  testimony, they were objections that had previously been

20  discussed with counsel for the defendant and overruled.

21  Therefore, the Court, because of these reasons, will overrule

22  the concerns set forth in the defendant's letter to the Court.

23           Now, do you want to address the 3E1.1 motion?

24           MS. GREENWOOD:  If probation believes that the

25  defendant still qualifies for two points for acceptance of

1   responsibility then the government makes its motion for the

2   third-point reduction.

3           THE COURT:  Mr. Blevins, do you believe that the

4   defendant still qualifies for that?

5           MR. BLEVINS:  I do, your Honor.

6           THE COURT:  Very well.  Then that motion is granted.

7   And the Court hereby now announces and determines that the

8   following applicable advisory guidelines apply to this

9   afternoon's sentencing:

10          Total Offense Level 31; Criminal History Category VI;

11  188 to 235 months imprisonment; at least 4 years supervised

12  release; $15,000 to $2 million fine; and a $100 special

13  assessment.

14          Mr. Enoch, I'll call on you or the defendant or both

15  of you, as you wish, to make any statements or present any

16  information in mitigation of this sentence.

17          MR. ENOCH:  Thank you, your Honor.  I'll go first.  I

18  do believe that Mr. King is going to want to make a statement

19  to the Court.  But before he does, I would like to address an

20  issue that's come up repeatedly.  And we heard it many times

21  just a minute ago, is that so many of these things are deemed

22  not relevant because of the career offender status.

23          But since the Supreme Court's ruling in *Booker*,

24  there's been a steady stream of cases that's re-enforced the

25  advisory nature of these guidelines.  In *GALL VERSUS U.S.* 128

1    Supreme Court 586, the Supreme Court made it clear that it's

2    incumbent on the District Court to make an individual finding

3    and assessment and appropriate sentence, not under the

4    guidelines, but under 18 U.S.C. 3553(a), the factors there that

5    are talking about what is a reasonable and appropriate sentence

6    for the individual circumstances of this individual defendant.

7            So that's -- my comments will be addressed to that

8    issue.  I don't have an issue with the findings of the

9    guidelines, how the guidelines were applied.  My response is

10   that these guidelines really turn on two very harsh and

11   critical applications of the guidelines, sentencing guidelines.

12   First, the disparity between cocaine crack and base and powder.

13   It's a hundred to one, and it's been amended, and the

14   sentencing guidelines got moved.  But it's an ongoing issue.

15   It's an issue that the Senate has just passed a bill to try to

16   resolve again, to try to reduce that huge disparity between

17   crack and cocaine base and powder.  So I think it's very much

18   an area where the Court can exercise its discretion in quantity

19   assignments to say that that is really still -- those numbers

20   are still not legitimate.

21           The second is the career offender status.  And that

22   career offender status has been a hot bed of activity during

23   the past couple of years.  Particularly in the Eleventh

24   Circuit, *Vasquez versus U.S*. which is 558 Fed 3rd 1224.  That's

25   an Eleventh Circuit case from 2009.  That case was taken to the

1    Eleventh Circuit because the District Court, in its findings,

2    said that it disagreed with the guidelines, with the career

3    offender guidelines, as a matter of principle, not as a matter

4    of application to that individual defendant.  And so

5    sentence -- and sentenced the defendant based, not on the

6    career offender guidelines, but on their other drug quantity

7    guidelines.

8          The government appealed that case to the Eleventh

9    Circuit where the Eleventh Circuit said, no, because that is a

10   congressional mandate, the Court doesn't have that discretion

11   to ignore those guidelines.  That was based on arguments by the

12   government appealing Mr. Vasquez' sentence.

13         On resentencing, he was sentenced on the career

14   offender level, at which point he appealed.  That appeal went

15   to the U.S. Supreme Court where it was granted cert based on a

16   petition that the government now filed, the solicitor general

17   now filed, changing their position to say, no, that's not the

18   case.  The case is that the District Court -- what *Booker* says

19   is that the District Court has discretion over all aspects of

20   implementing the guideline ranges.  And they can do it based on

21   the individual and that individual's circumstances.  Or the

22   Court can impose it based on a belief that that guideline, that

23   criminal offender guideline is just bad policy and it's not

24   right.  It's overly harsh.  It's not based on the fact-finding

25   and empirical evidence that was supposed to be the basis of the

1    sentencing guidelines.  Instead, it's based on policy.

2           What the government's own attorneys argued before the

3    Supreme Court that if it was a mandatory application then

4    Congress could have done that by directing it in a statute

5    rather than directing it to the sentencing guidelines.

6           So we are really faced today with a man who, he has a

7    substantial criminal record.  He's not a choir boy.  Nobody is

8    standing up here saying that he is.  But I think there are

9    significant mitigating factors when you go to apply these very

10   harsh application of the guidelines.

11          The first is that he has two violent felonies.  Those

12   are the two felonies that make him a career offender.  The

13   first one of those violent felonies was committed as a

14   juvenile.  He was sentenced as an adult, but he committed it as

15   a young 17-year-old.  So, first, it was a youthful act.  It was

16   not the act of an adult.  Second, it was 13 years ago.  It was

17   1997.

18          Is that correct?

19          THE DEFENDANT: No, '95.

20          MR. ENOCH: '95.  So 15 years ago.  So we're reaching

21   back over half this man's life to look at that first

22   conviction, a conviction of an act that took place as a youth.

23   He served three years for that conviction.  He had a second

24   assault charge in 2000.  He served three years for that assault

25   charge.  He did his time.  He got out.  From that point

1  forward, from that 2000 conviction forward, his criminal record

2  is littered with minor, petty offenses.  They're alluding the

3  police, driving without a license.  There's not a significant

4  criminal conviction from 2000 forward.  What we have is a

5  stream of probation revocations based on his actions since he

6  got out of prison.

7        So we're really, to career this man out, we're

8  looking at going back over ten years to the last significant

9  criminal act, and then 15 years to get into the first criminal

10 act, an act committed as a juvenile.  So I would argue, your

11 Honor, that, first, that these career offender guidelines are

12 bad policy.  And I would ask the Court to not apply them based

13 on that.  But even if you don't agree with me on that, that as

14 they apply to this individual, that they are inappropriate to

15 apply because of the youth and the age of the convictions.  And

16 the fact that for almost ten years, he's had bumps and scrapes,

17 but they weren't drug convictions, they weren't violent

18 convictions.  They were driving without a license, driving with

19 license suspended, alluding the police.  They were scrapes.

20       The Presentence Investigation Report shows that he

21 worked during the time he was not in prison.  He worked

22 actively as a roofer.  Now, part of the problem with

23 documenting that and the extent of his work is that he was

24 working off the W-2.  He wasn't on a W-2.  He was getting paid

25 cash.  This man has got two felonies.  He can't get a

1    legitimate job.  But he was working and supporting his family.

2    He was making it.  But he's constantly getting into scrapes.

3            So then he runs into Reginald Beale.  And talk about

4    making the worst decision in your life.  An investigation has

5    being going on for 18 months.  He manages to show up for the

6    last 30 days of it.  That was his involvement in it, showing up

7    at the end just in time to get caught.

8            Your Honor, I believe that in looking at an

9    individualized sentence that's called for by the statute, a

10   sentence that serves the purposes of remediating him, making --

11   getting him some hope of being a productive member of this

12   society again, we cannot put this man away for 15 years and

13   expect that at age 47, really not having any active work

14   history in mainstream society, that he's going to have any

15   chance of ever having a productive life in our society.

16   Clearly, he understands and he knows and he was going to tell

17   you that he understands.  This is his bag.  This was his bad.

18   There's no question.  He doesn't have any question about it.

19           Ms. Greenwood has indicated he has cooperated.  He is

20   working with the government to atone for what he's done.  But

21   I'm asking for some mercy.  I'm asking that we look at this on

22   an individual basis and not just plug him into a square peg,

23   your Honor.

24           THE COURT:  Okay, Mr. King.

25           Thank you, Mr. Enoch.

1              THE DEFENDANT:  Yes, sir.  I would just like to say

2    that I know what I did was wrong.  I regret for the decision

3    that I made.  At the time, I was going through some financial

4    problems.  And, of course, I got involved with the wrong

5    people.  It causes me a great deal of stress.  A great deal of

6    my life I've been incarcerated, throughout my youth.  And I'm

7    here now, a 32-year-old man, facing here another sentence for a

8    bad decision that I made on my behalf.

9              I did everything Ms. Nancy Greenwood wanted me to do,

10   told them what was my part in the investigation.  I came in the

11   investigation at the end three weeks.  I made a bad decision,

12   your Honor.  Which, I have made bad decisions in the past in my

13   life.

14             And I got four kids, a 15-year-old son that going

15   down the same path I'm going down.  I just wish I could make it

16   back out there to him before he make the same decision that I

17   made.  I mean, I was wrong for what I did.  Nobody made me get

18   with Reginald Beale.  I chose to.  And I stand in front of you,

19   in front of you, and I'm admitting to what I did was wrong.

20             But to be -- to continue to be convicted of charges

21   that I served time for, I feel is unfair.  But I leave that in

22   your hands, your Honor, to have mercy on me.  And at this time

23   I'm just apologizing to what I did was wrong to society and the

24   people that I did wrong to.  I even apologize to my family

25   members that I caused pain on.  It's been a long journey.  And

1    I never dealt with the federal government a day in my life.

2    But I'm here now before you.

3            It's hard.  It's hard, your Honor.  I made a bad

4    decision.  I pray that you have mercy on me and my sentence.  I

5    know I have to serve some time, sir.  And I accept that time,

6    sir.  But I only dealt with Reginald Beale out of financial

7    stress trying to make things happen for my family.  If you

8    could see, I was behind in child support, behind in probation.

9    I just had got pulled over for another driving with no license.

10           And he gave me a proposition.  He paid the $500 to

11   get out of jail, and it went on from there, sir.  I really

12   ain't no drug dealer.  I would prefer to work.  But I made one

13   bad decision -- I made that bad decision.  I'm not going to say

14   one bad decision because I had made bad decisions in past.  But

15   I made this bad decision.  And it's really heavy on me, sir.

16           THE COURT:  Thank you, Mr. King.

17           Anything else, Mr. Enoch?

18           MR. ENOCH:  No, sir, your Honor.

19           THE COURT:  Ms. Greenwood, your response.

20           MS. GREENWOOD:  Thank you, your Honor.

21           Well, this defendant, at 17, was convicted of a drug

22   offense, possession of cocaine.  And he was -- well, at 17 is

23   when he was arrested.  Same age, a few months later, he was

24   arrested on the aggravated assault, which is one of his violent

25   felonies that triggers the career offender.  Five years later,

1   he had another aggravated assault that he was convicted of,

2   which also is the trigger for the career offender.  And this

3   individual, as you can tell by looking at his criminal history

4   report, I mean, Mr. Enoch makes an interesting plea that if you

5   lock him up for 15 years he's not going to have any chance to

6   become a productive member of society.  Well, I'm afraid to

7   say, that train left the station.

8           He had an opportunity back when he got arrested, back

9   at the age of 17, twice in six months -- in a span of six

10   months -- to turn his life around.  But, instead, what he did

11   was he would get locked up, then he'd get out.  And he'd get

12   his probation revoked because he'd make some violation of law

13   or probation conditions.  And he'd get locked up again.  And

14   then he'd be released.  And then he'd get locked up again.  I

15   mean, this is not an individual who, you know, has had one bad

16   scrape with the law and just, you know, hit the big time when

17   he did it.

18           I mean, there are people who get caught up in this

19   drug stuff, and the first time they get napped is in federal

20   court when they've never had any problems before.  That's not

21   this defendant.  This defendant, as you can see from his

22   criminal history, and there's been no challenges to the actual

23   point calculation of his criminal history points that have been

24   added up by the probation officer.  There were some concerns

25   that maybe certain things shouldn't be included in because of

1   this or that or he didn't plead guilty to it so it shouldn't be

2   mentioned.  But the reality is that these points add up to 14.

3   I mean, he's a Criminal History Category of VI whether he's a

4   career offender or not.  And his offense level is a 34 whether

5   he's a career offender or not.  The reality is based upon the

6   findings of this Court already, in part based on the overruling

7   of the objection, this Court has already found that the drug

8   quantity calculation is accurate.

9           There was certainly testimony to support this

10  defendant's knowledge of the firearm, and that came into play

11  into giving him an offense level of 34.  If you just look at

12  that aside from the career offender -- he is in exactly the

13  same position as a career offender as he would be if you looked

14  at him based on the drug quantity and his involvement in this

15  particular conspiracy.

16          I think that, you know, this is not -- this is a guy

17  who's actually already gotten a break.  The government allowed

18  him -- and he's been cooperating, and he may get a further

19  break.  But the government allowed him to plead to a lesser

20  included offense of the conspiracy so that his maximum term,

21  statutory term, was 40 years instead of life.  His drug

22  quantity certainly supported a conviction of 50 grams and

23  higher of crack cocaine where he would have been looking at ten

24  years to life.  But instead we allowed him to plea to the

25  lesser included offense to give him a little bit of a break on

1    his sentence because he wasn't the most culpable of the people

2    involved in this conspiracy.  But as a result, he started at a

3    34 with his career offender calculation instead of a 37.  If he

4    had started at a 37 and then got the three points off for

5    acceptance of responsibility, he would be looking at 262 months

6    and up.  And instead he's looking at 188 and up.

7         So this defendant has gained some benefits already.

8    And you know, the government, you know, as part of that

9    agreement -- and we're not backing away from it, we feel it is

10   appropriate under the circumstances.  But to further that by,

11   you know, indicating that he somehow is, you know, wasn't

12   really that involved or somehow -- I mean, he's got two prior

13   aggravated assaults, violent felonies -- and that's not

14   insignificant -- in addition to other charges that do not carry

15   quite as much weight, but because his continued criminal

16   activity landed him back in jail and increased his criminal

17   history points.

18        And we feel that a guideline's range sentence is

19   appropriate.  We don't think that the elements under 18 U.S.C.

20   3553(a) would justify a diversion or variance from those

21   guidelines.  And we would ask for a sentence within that

22   guideline range.

23        THE COURT:  Okay.  Thank you.

24        Anything else from anyone?

25        MR. ENOCH:  No, sir, your Honor.

1              THE COURT:  Thank you.

2              All right.  I've listened to the defendant and his

3     counsel.  And I have reviewed the Presentence Report.  I have

4     also considered the factors set forth in 18 United States Code

5     Section 3553(a).  Pursuant to the Sentencing Reform Act of

6     1984, it is the judgment of this Court that the defendant,

7     Derrick D. King, is hereby committed to the custody of the

8     Bureau of Prisons to be imprisoned for a term of 220 months.

9              The Court finds no reason to depart from the sentence

10    called for by application of the sentencing guidelines, which

11    range exceeds 24 months.  And the reasons for imposing the

12    selected sentence are as follows:

13             This defendant has an extensive criminal history,

14    which includes six felony conviction.  Two of those convictions

15    were for the offenses of aggravated assault, which resulted in

16    sentences being imposed in 1996 and 2000.  Those convictions

17    resulted in this defendant being designated a career offender

18    pursuant to the provisions of United States Sentencing

19    Guideline Section 4B1.1.

20             At the time he committed the instant offense,

21    Mr. King was on probation.  It is apparent that Mr. King is a

22    danger to the community as evidence by his continued criminal

23    conduct.  Accordingly, a sentence above the midpoint of the

24    sentencing guideline range is the appropriate societal response

25    in this particular case.

1          Mr. King does not have the ability to pay a fine

2     within the guideline range.  However, after consideration of

3     the factors set forth at United States Sentencing Guideline

4     Section 5E1.2(d), the Court finds that Mr. King does have the

5     ability to pay the sum of $2,000.  While in the custody of the

6     Bureau of Prisons, Mr. King shall make payments of either

7     quarterly installments of a minimum of $25 if working

8     non-UNICOR or a minimum of 50 percent of monthly earnings if

9     working UNICOR.  Upon release from imprisonment and while on

10    supervised release, Mr. King shall make minimum monthly

11    payments of $100 over a period of 20 months.  Payments are to

12    be made payable to the Clerk of the United States District

13    Court.

14         The Court has determined that Mr. King does not have

15    the ability to pay interest.  It is ordered, therefore, that

16    the interest requirement is waived.  It is further ordered that

17    Mr. King shall pay to the United States a special assessment of

18    $100 which shall be due immediately.

19         Upon release from imprisonment, Mr. King shall be

20    placed on supervised release for a term of five years.  While

21    on supervised release, he shall comply with the standard

22    conditions of supervision adopted by this Court and the

23    mandatory conditions required by 18 United States Code Section

24    3583, which will include, but not be limited to, urine testing,

25    a prohibition against possession of any firearm or any other

1   dangerous weapon, and a prohibition against the violation of

2   any law.

3          Further, Mr. King shall cooperate in the collection

4   of a DNA sample as directed by probation officer pursuant to 18

5   United States Code Section 3583.

6          Mr. King shall participate in a program of testing

7   for drug and alcohol abuse.  And if the Court determines that

8   it is necessary, he shall participate in a program of treatment

9   for drug and alcohol abuse.  Further, Mr. King shall not tamper

10  with any testing procedures.  It is recommended that Mr. King

11  be evaluated by Bureau of Prisons officials to establish his

12  participation in an appropriate program of substance abuse

13  treatment and counseling during his term of incarceration.

14         Mr. King shall refrain from participation in any

15  gang-related activity or association with any gang members.

16         Mr. King shall provide the probation officer with

17  access to any requested financial information.  He shall not

18  incur new credit charges or open additional lines of credit

19  without the approval of the probation officer unless he is in

20  compliance with the installment payment schedule.

21         Mr. King shall submit his person, residence, office

22  or vehicle to a search conducted by a United States probation

23  officer at a reasonable time and in a reasonable manner based

24  upon reasonable suspicion of contraband or evidence of a

25  violation of a condition of release.  Failure to submit to a

1   search may be grounds for revocation.  Mr. King shall warn any

2   other residents that the premises may be subject to searches

3   pursuant to this condition.

4          A curfew is imposed as a special condition of

5   supervised release.  Mr. King shall not leave his residence

6   from 10:00 p.m. until 6:00 a.m. during the period of

7   supervision except when such leave is approved in advance by

8   the probation officer.

9          Probation officer is hereby directed to provide

10  Mr. King with a written statement that sets forth all of the

11  conditions to which the term of supervised release is subject.

12         The Court has accepted the plea agreement because it

13  is satisfied that the agreement adequately reflects the

14  seriousness of the actual offense behavior and that accepting

15  the plea agreement will not undermine the statutory purposes of

16  sentencing.

17         In accordance with the plea agreement, it is ordered

18  that Counts 21, 24 and 32 of the indictment be dismissed as to

19  Mr. King.  It is further ordered that Mr. King is remanded to

20  the custody of the United States Marshal.

21         Mr. King, pursuant to the plea agreement, with

22  limited exceptions, you have waived all rights conferred by 18

23  United States Code Section 3742 to appeal this sentence.  You

24  have also waived the right to appeal this sentence on any other

25  ground and have waived the right to attack this sentence in any

80

1   post-conviction proceeding.

2           Sentence has now been pronounced.  Other than any

3   objections which have previously been stated for the record,

4   does anyone now have any objections to the Court's findings of

5   fact, conclusions of law or to the manner in which sentence has

6   been pronounced?

7           Ms. Greenwood?

8           MS. GREENWOOD:  No, your Honor.

9           THE COURT:  Mr. Enoch?

10          MR. ENOCH:  No, sir, your Honor.  One request.  And

11  that would be, I understand that Mr. King is going to be turned

12  back over to the state authorities for a probation revocation.

13  And I don't know what influence you may have on getting that

14  served as a consecutive sentence if there is a probation

15  revocation.

16          THE COURT:  I don't believe I have any influence over

17  that, Mr. Dallas or Blevins?

18          MR. BLEVINS:  I would not take any position as to

19  that, your Honor.  Our sentence is imposed here.  The State

20  will do whatever they want to do.

21          THE COURT:  Okay.  Well, this matter is now

22  concluded.  Thank you very much.

23          Mr. Enoch, thank you for your service to the Court.

24                      (Matter concluded at 1:13 p.m.)

25

1                        CERTIFICATION

2

3            I certify that the foregoing is a true and correct

4    transcript of the stenographic record of the above-mentioned

5    matter.

6

7    /s/Rhea Rangel                         June 15, 2010

8    Rhea Rangel, Court Reporter            Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25